**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
-----------------------------x
                              :
ENT AND ALLERGY ASSOCIATES,   :    Civ. No. 3:21CV00289(SALM)
LLC, LITCHFIELD HILLS         :
ORTHOPEDIC ASSOCIATES, LLC,   :
and LITCHFIELD HILLS SURGICAL :
CENTER, LLP                   :
                              :
v.                            :
                              :
CONTINENTAL CASUALTY COMPANY  :    March 3, 2022
and CNA FINANCIAL CORPORATION :
                              :
-----------------------------x
```

**RULING ON MOTION TO DISMISS [Doc. #29]**

Defendants have filed a motion pursuant to Federal Rule of Civil Procedure 12(b)(6) seeking to dismiss the Complaint in its entirety. [Doc. #29]. Plaintiffs have filed a memorandum in opposition to the motion to dismiss [Doc. #35], to which defendants have filed a reply [Doc. #40]. For the reasons stated herein, the Motion to Dismiss [**Doc. #29**] is **GRANTED**.

I.   **Procedural Background**

Plaintiffs ENT and Allergy Associates, LLC ("ENT"), Litchfield Hills Orthopedic Associates, LLC ("Litchfield Hills Orthopedic"), and Litchfield Hills Surgical Center, LLP ("Litchfield Hills Surgical Center"), brought this action on March 5, 2021, against two named defendants: Continental

Casualty Company ("Continental") and CNA Financial Corporation ("CNAF"). See Doc. #1 at 1.[1]

Defendants filed a Motion to Dismiss, and plaintiffs filed a Motion for Partial Summary Judgment, both on April 15, 2021. See Doc. #28, Doc. #29. This matter was transferred to the undersigned on October 21, 2021. See Doc. #70. Plaintiffs subsequently filed a Motion for Leave to File Amended Complaint on November 22, 2021. See Doc. #83. On February 1, 2022, after defendants' Motion to Dismiss had been pending for nine and a half months, plaintiffs filed a Motion to Certify Questions of State Law to the Connecticut Supreme Court. See Doc. #93.

## II. **Factual Background**

The Court accepts the following allegations as true, solely for purposes of this Motion to Dismiss.

"For many years, Plaintiffs have operated medical practices" in the state of Connecticut. Doc. #1 at 2. "Defendants issued Policy No. B 6011680724 to ENT and Allergy Associates, LLC for a policy period of September 1, 2019 to September 1, 2020." Id. at 6. Similarly, "Defendants issued Policy No. B 6011179848 to Litchfield Hills Orthopedic Associates, LLP for a policy period of January 1, 2020 to

---

[1] Throughout this Ruling, the Court cites to the page numbers reflected in each document's ECF header, rather than any numbering applied by the filing party.

January 1, 2021. Litchfield Hills Surgical Center, LLP is an additional insured under that Policy." Id.[2]

In March 2020, the State of Connecticut issued a series of orders that directed "all residents in Connecticut to stay at home, impos[ed] social distancing rules, limited occupancy of buildings, and reiterated that any entity that does not employ individuals to perform essential worker functions ... shall adhere to limitations on social gatherings and social distancing set forth in the Order." Id. at 13. As a result of these orders, plaintiffs allege that they were forced to "cease and/or significantly reduce operations at the premises described in the Policies and to incur Extra Expenses." Id. at 15.

Plaintiffs further contend: "The existence of SARS-CoV-2 caused direct physical loss of or damage to the covered property or 'premises' under the Plaintiffs' Policies, by denying use of and damaging the covered property, and by causing a necessary suspension (in whole or in part) of operations during a period of restoration and requiring prevention, repair and restoration measures." Id. Specifically, plaintiffs allege that:

> 101. Plaintiffs' suffered direct physical loss of or damage to Covered Property and resulting in loss of Business Income due to:

---

[2] Plaintiffs' policies are referred to collectively throughout this Ruling as the "Policies."

> a.    The actual presence of SARS-CoV-2 at the Covered
>        Properties and resulting contamination or other
>        damage;
>
> b.    The imminent risk of contamination and other
>        damages and damages caused by SARS-CoV-2; and
>
> c.    Both the voluntary and government mandated
>        suspension and cessation of Plaintiffs' business
>        operations in response to the presence and imminent
>        risk posed by SARS-CoV-2.

Id. at 21 (sic).

The Policies, by their terms, provide coverage "for direct physical loss of or damage to Covered Property ... caused by or resulting from a Covered Cause Of Loss." Doc. #29-2 at 15 (ENT policy); see also Doc. #29-3 at 19 (Litchfield Hills Orthopedic policy). The Policies cover "Business Income" losses as follows: "We will pay for the actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration.' The 'suspension' must be caused by direct physical loss of or damage to property at the described premises." Doc. #29-2 at 37; see also #29-3 at 41.

As to "Extra Expense" coverage, the Policies provide that defendants will pay for "reasonable and necessary expenses you incur during the 'period of restoration' that you would not have incurred if there had been no direct physical loss of or damage to property caused by or resulting from a Covered Cause of Loss." Doc. #29-2 at 38; see also Doc. #29-3 at 42.

Finally, as to "Civil Authority" coverage, the Policies provide:

> When the Declarations show that you have coverage for Business Income and Extra Expense, you may extend that insurance to apply to the actual loss of Business Income you sustain and reasonable and necessary Extra Expense you incur caused by action of civil authority that prohibits access to the described premises. The civil authority action must be due to direct physical loss of or damage to property at locations, other than described premises, caused by or resulting from a Covered Cause of Loss.

Doc. #29-2 at 63; see also Doc. #29-3 at 67.

"Plaintiffs submitted notices of loss to Defendants due to the probable presence of SARS-CoV-2 and the COVID-19 Pandemic. The Defendants denied ENT and Allergy Associates, LLC's claim and has not responded to Litchfield Hills Orthopedic Associates, LLP and Litchfield Hills Surgical Center, LLP's claim." Doc. #1 at 17 (sic).

Defendants rejected ENT's claim for coverage on several grounds. While plaintiffs do not pursue Business Personal Property coverage in this case, defendants' denial of ENT's claim under that provision is informative:

> The Property Coverage provides that CCC "will pay for direct physical loss of or damage to the Covered Property at the premises described in the Declarations caused by or resulting from a Covered Cause of Loss." EAA has not reported any "direct physical loss or damage" to its business personal property. Rather, the claim reported is limited to an interruption to EAA's business caused not by any physical loss or damage to Covered Property, but by the aforementioned reluctance of your patients due to the fear of COVID-19 to come to your office to be

seen. The Business Personal Property coverage therefore does not apply.

Doc. #1-4 at 3.

Defendants also found that ENT was not entitled to Business Income and Extra Expense coverage, stating:

> [Business Income and Extra Expense coverage] is conditioned on "direct physical loss of or damage to property at the described premises[.]" You have not claimed, however, and our investigation revealed no evidence that EAA's operations were suspended because of any direct physical loss of or damage to property at that location.

Id. at 4.

Defendants further asserted in the denial letter that certain exclusions in ENT's policy might preclude coverage:

> Even if there had been direct physical loss of or damage to property at the described premises or at locations other than the described premises, as required under the Policy provisions, the Policy also contains exclusions that might bar coverage for your claim. For example, the Policy contains exclusions for loss or damage caused by or resulting from consequential loss, meaning loss of use, delay, or loss of market (section B.2.b.), and loss or damage caused by or resulting from contamination (section B.2.d.8.) or contaminants (section B.2.k.). Those exclusions might bar coverage for property damage and/or loss of business income caused by COVID-19, even if the other requirements to trigger coverage under the Policy were met.

Id.

Plaintiffs argue that defendants wrongfully denied coverage under the Policies' Business Income, Extra Expense, and Civil Authority Endorsements.[3]

## III. **Legal Standard**

"When deciding a motion to dismiss, a district court may consider documents attached to the complaint or incorporated by reference into the complaint[,]" including an insurance policy referenced in the complaint. New Image Roller Dome, Inc. v. Travelers Indem. Co. of Ill., 310 F. App'x 431, 432 (2d Cir. 2009) (citation omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation and quotation marks omitted); accord Kaplan v. Lebanese Canadian Bank, SAL, 999 F.3d 842, 854 (2d Cir. 2021). In reviewing such a motion, the Court "must accept as true all nonconclusory factual allegations in the

---

[3] The Complaint also asserts the right to coverage under the Policies' "Sue and Labor" provision. Doc. #1 at 20. Defendants have moved to dismiss as to this theory. See Doc. #29-8 at 41. However, plaintiffs' memorandum in opposition does not respond to that argument. See generally Doc. #35. Plaintiffs' claim for relief under the Policies' "Sue and Labor" provision is therefore abandoned and will not be considered in deciding defendants' motion. See Malik v. City of N.Y., 841 F. App'x 281, 284 (2d Cir. 2021) ("[A] court may infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned[.]" (citation and quotation marks omitted)).

complaint and draw all reasonable inferences in the Plaintiffs' favor." Kaplan, 999 F.3d at 854 (citations omitted).

"[W]hile this plausibility pleading standard is forgiving, it is not toothless. It does not require [the Court] to credit legal conclusions couched as factual allegations or naked assertions devoid of further factual enhancement." Mandala v. NTT Data, Inc., 975 F.3d 202, 207 (2d Cir. 2020) (citation and quotation marks omitted). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." Iqbal, 556 U.S. at 678 (citation and quotation marks omitted).

## IV.  Law Regarding Interpretation of Insurance Policies

The parties agree that Connecticut law applies in this case. See Doc. #29-8 at 18; Doc. #35 at 13. Under Connecticut law, "[a]n insurance policy is to be interpreted by the same general rules that govern the construction of any written contract. ... If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning." Lexington Ins. Co. v. Lexington Healthcare Grp., Inc., 84 A.3d 1167, 1173 (Conn. 2014) (citation and quotation marks omitted). The "policy language remains the touchstone of our inquiry." Conn. Ins. Guar. Ass'n v. Fontaine, 900 A.2d 18, 22 (Conn. 2006).

"A contract of insurance must be viewed in its entirety, and the intent of the parties for entering it derived from the four corners of the policy giving the words of the policy their natural and ordinary meaning and construing any ambiguity in the terms in favor of the insured." Misiti, LLC v. Travelers Prop. Cas. Co. of Am., 61 A.3d 485, 490-91 (Conn. 2013) (citations and quotation marks omitted). However, the Court need not resolve an ambiguity that does not exist, and must not manufacture one. Thus, the "rule of construction that favors the insured in case of ambiguity applies only when the terms are, without violence, susceptible of two equally reasonable interpretations." Id. at 491 (citation and quotation marks omitted).

> In determining whether the terms of an insurance policy are clear and unambiguous, a court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity. Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms.

Zulick v. Patrons Mut. Ins. Co., 949 A.2d 1084, 1088 (Conn. 2008) (citation and quotation marks omitted). The Court will not find that ambiguity exists "simply because lawyers or laymen contend for different meanings[]" of certain words, or simply "because a contract fails to define them[.]" New London Cnty. Mut. Ins. Co. v. Nantes, 36 A.3d 224, 235 (Conn. 2012) (citations and quotation marks omitted); see also Misiti, LLC, 61 A.3d at 491 ("The fact that the parties advocate different

meanings of the insurance policy does not necessitate a conclusion that the language is ambiguous." (citations and quotation marks omitted)).

V. **Discussion**

Plaintiffs' Complaint sets forth two claims. Count One asserts a claim for "Breach of Contract[,]" alleging that defendants have "refused to pay the Plaintiffs under its Business Income, Extra Expense, Civil Authority, and Sue and Labor coverages for losses suffered due to the COVID-19 Pandemic[.]" Doc. #1 at 4; see also id. at 18-21.[4] Count Two alleges a "Breach of the Covenant of Good Faith and Fair Dealing[.]" Id. at 21.[5]

---

[4] Plaintiffs assert that Litchfield Hills Orthopedic and Litchfield Hills Surgical Center have not yet received a resolution of their claim. See Doc. #1 at 17. However, the parties address all of plaintiffs' claims for breach of contract together, appearing to treat defendants' failure to respond to Litchfield Hills Orthopedic and Litchfield Hills Surgical Center's claim as an effective denial of coverage. Accordingly, the Court does not distinguish between plaintiffs with denied claims and plaintiffs with unresolved claims when conducting its breach of contract analysis.

[5] Plaintiffs have filed a Motion for Leave to File Amended Complaint to add claims for "violations of the Connecticut Unfair Trade Practices Act ('CUTPA') and the Connecticut Unfair Insurance Practices Act ('CUIPA')." Doc. #83 at 1. Defendants contend that plaintiffs' motion to amend their complaint should be denied because, among other reasons, "the proposed Amended Complaint ... lacks merit." Doc. #87 at 6. Plaintiffs' Motion for Leave to File Amended Complaint is addressed infra at 31-39.

Defendants move to dismiss all claims against them, contending that: (1) plaintiffs' breach of contract claim "fail[s] to plausibly allege any 'direct physical loss of or damage to property' -- a threshold requirement under the Policies[,]" Doc. #29-8 at 19; and (2) plaintiffs have "failed to allege a valid breach of the implied covenant of good faith and fair dealing." Id. at 44.

**A.   Breach of Contract**

Plaintiffs' breach of contract claim fails because they have not adequately alleged direct physical loss or damage under the Policies.

1.   Relevant Contractual Provisions

Plaintiffs assert the right to coverage under the: (1) Business Income Endorsement; (2) Extra Expense Endorsement; and (3) Civil Authority Endorsement. See Doc. #1 at 4. Each of these provisions requires "direct physical loss of or damage to property[.]" Doc. #29-2 at 37, 38, 63; see also #29-3 at 41, 42, 67.

Plaintiffs first assert the right to coverage under the Business Income Endorsement. The Business Income Endorsement provides: "We will pay for the actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration.' **The 'suspension' must be caused by direct physical loss of or damage**

**to property at the described premises**." Doc. #29-2 at 37 (emphasis added); see also #29-3 at 41. Thus, under the Business Income Endorsement, "direct physical loss of or damage to property" is necessary to trigger the right to coverage.

Second, plaintiffs assert the right to coverage under the Extra Expense Endorsement. The Extra Expense Endorsement states that defendants will provide coverage for "reasonable and necessary expenses you incur during the 'period of restoration' that you would not have incurred **if there had been no direct physical loss of or damage to property caused by or resulting from a Covered Cause of Loss**." Doc. #29-2 at 38 (emphasis added); see also Doc. #29-3 at 42. Thus, before coverage under the Extra Expense Endorsement is triggered, a "direct physical loss of or damage to property" is required.

Finally, plaintiffs assert the right to coverage under the Civil Authority Endorsement. The Policies' Civil Authority Endorsement provides, in relevant part: "**The civil authority action must be due to direct physical loss of or damage to property** at locations, other than described premises, caused by or resulting from a Covered Cause of Loss." Doc. #29-2 at 63 (emphasis added); see also Doc. #29-3 at 67. Thus, before coverage under the Civil Authority Endorsement is triggered, a "direct physical loss of or damage to property" is similarly required.

In sum, each provision under which plaintiffs assert the right to coverage requires a "direct physical loss of or damage to property." Because the Court finds that plaintiffs have not adequately alleged any "direct physical loss of or damage to property" under the Policies, plaintiffs fail to state a claim for breach of contract.

2.   The Policies' Language

The Court turns to the threshold interpretive issue of the policy language. The Court finds that the language of the Policies' "direct physical loss of or damage to property" requirement is not ambiguous. Where, as here, a term is undefined in an insurance policy, "it must be given its plain, ordinary meaning." Costabile v. Metro. Prop. & Cas. Ins. Co., 193 F. Supp. 2d 465, 477 (D. Conn. 2002).

A review of the plain, ordinary meaning of the phrase "direct physical loss of or damage to property" reveals that "the language of the [Policies] was clear and unambiguous, and required coverage only in the event of some physical harm to property, which was not present here." Jeffrey M. Dressel, D.D.S., P.C. v. Hartford Ins. Co. of the Midwest, Inc., No. 20CV02777(KAM)(VMS), 2021 WL 1091711, at *3 (E.D.N.Y. Mar. 22, 2021). Indeed, as the Eastern District of New York has aptly explained:

> The plain language of "physical loss of ... property"
> does not mean, as Plaintiff argues, a loss of the ability
> to run the business. A "physical loss" means that
> physical property suffered a loss. Plaintiff, however,
> does not allege that its loss of income was caused by
> any physical property suffering a loss, in value or
> otherwise. Similarly, "physical damage to property" can
> only mean that the physical property suffered some sort
> of physical damage.

Id.

The undersigned agrees with this analysis. "Deriving the plain and ordinary meaning of [virtually] identical contract language from the dictionary, courts in this Circuit have repeatedly concluded that the phrase direct physical loss of or physical damage to [property] connotes a negative alteration in the tangible condition of property, that is, that this phrase requires some form of actual physical damage to the insured premises." Mario Badescu Skin Care Inc. v. Sentinel Ins. Co., No. 20CV06699(AT), 2022 WL 253678, at *4 (S.D.N.Y. Jan. 27, 2022) (citations and quotation marks omitted). "Losing the ability to use otherwise unaltered or existing property simply does not change the physical condition or presence of that property and therefore cannot be classified as a form of 'direct physical loss' or 'damage.'" Michael Cetta, Inc. v. Admiral Indem. Co., 506 F. Supp. 3d 168, 176 (S.D.N.Y. 2020), appeal withdrawn, No. 21-57-cv, 2021 WL 1408305 (2d Cir. Mar. 23, 2021).

The language of the Policies is not "reasonably susceptible to more than one reading." Lexington Ins. Co., 84 A.3d at 1173 (citation and quotation marks omitted). Plaintiffs advance their own proposed interpretation of the relevant language in their summary judgment motion, pointing out, inter alia, that "Merriam-Webster defines 'physical' as meaning 'having material existence: perceptible especially through the senses and subject to the laws of nature' and 'of or relating to material things.'" Doc. #28-1 at 12-13 (citation omitted). Plaintiffs then argue that they have suffered a "'direct physical loss' of property" because "they have been deprived of their property in an actual, material, and perceptible way in that they were unable to use their properties for their intended purposes, namely, running the plaintiffs' businesses." Id. at 13. However, the mere fact that plaintiffs were deprived of the full desired use of their properties does not mean that there was an actual loss of those properties. Rather, the property itself was unharmed, and remained in the same condition it was in prior to the pandemic. Contrary to plaintiff's assertion, "the term 'physical loss or damage' is clear and unambiguous. It requires actual physical damage to the insured's property. Mere loss of use or functionality will not do." St. George Hotel Asocs., LLC v. Affiliated FM Ins. Co., No. 20CV05097(DG)(RLM), 2021 WL 5999679, at *6 (E.D.N.Y. Dec. 20, 2021).

The "court will not torture words to import ambiguity where
the ordinary meaning leaves no room for ambiguity." Zulick, 949
A.2d at 1088 (citation and quotation marks omitted). Thus, the
Court joins the "overwhelming weight of precedent[,]" St. George
Hotel Assocs., LLC, 2021 WL 5999679, at *6, in finding that the
plain meaning of the phrase "direct physical loss of or damage
to property" "connotes a negative alteration in the tangible
condition of property[.]" Mario Badescu Skin Care Inc., 2022 WL
253678, at *4 (citations and quotation marks omitted).

In an attempt to escape this conclusion, plaintiffs assert:
"[T]he disjunctive 'or' which distinguishes 'loss of' from
'damage to[]'" means that "whatever the meaning of 'direct
physical loss' may be, it cannot mean 'damage.'" Doc. #35 at 9.

"Multiple courts have convincingly rejected this theory
because the terms 'loss' and 'damage' are not redundant and have
readily different meanings." Conn. Children's Med. Ctr. v.
Cont'l Cas. Co., --- F. Supp. 3d ---, No. 3:21CV00291(JAM), 2022
WL 168786, at *4 (D. Conn. Jan. 19, 2022). "The fact that
'direct physical loss' and 'direct physical damage' both require
tangible alteration to property does not render either term
superfluous." Cosm. Laser, Inc. v. Twin City Fire Ins. Co., ---
F. Supp. 3d ---, No. 3:20CV00638(SRU), 2021 WL 3569110, at *14
(D. Conn. Aug. 11, 2021). To the contrary: "'[T]he word 'loss'
may refer to complete destruction while 'damage' connotes lesser

harm that may be repaired.'" Conn. Children's Med. Ctr., 2022 WL
168786, at *4 (quoting Sandy Point Dental, P.C. v. Cincinnati
Ins. Co., 20 F.4th 327, 332 (7th Cir. 2021)); see also Cosm.
Laser, Inc., 2021 WL 3569110, at *14.

The undersigned agrees. "Because the terms 'loss' and
'damage' are not redundant, there is no reason to adopt an
extravagant interpretation of the term 'direct physical loss' to
mean a functional 'loss of use' of one's property." Conn.
Children's Med. Ctr., 2022 WL 168786, at *4. Accordingly,
requiring tangible alteration to property in order to trigger
direct physical loss or damage under the Policies does not
render either term superfluous.

This interpretation finds further support in the Policies'
"Period of restoration" provision. The Policies explain that a
Period of restoration ends, and Business Income and Extra
Expense coverage thus terminate, on the earlier of: "**(1)** The
date when the property at the described premises should be
repaired, rebuilt or replaced with reasonable speed and similar
quality; or **(2)** The date when business is resumed at a new
permanent location." Doc. #29-2 at 32; see also Doc. #29-3 at
36.

Plaintiffs assert that the common meanings of the terms
repair, restoration, and rebuild contemplate non-physical
losses. See Doc. #35 at 26. Thus, according to plaintiffs, "[i]n

view of the ordinary definitions of 'repair, rebuild and replace' ... the plaintiffs clearly have alleged that such efforts are underway at the covered premises in response to a suspension of operations caused by their Pandemic losses." Id. at 27.

However, despite plaintiffs' arguments to the contrary, "[i]f there has been no physical alteration to the condition or location of the property, there is nothing to 'repair, rebuild, or replace.' Nor is there any reason to expect that, absent physical alteration to 'property at the insured's premises,' the business would resume at 'a new permanent location.'" Chief of Staff LLC v. Hiscox Ins. Co. Inc., 532 F. Supp. 3d 598, 603 (N.D. Ill. 2021) (citations omitted) (applying Connecticut law). Thus, the fact "[t]hat the policy provides coverage until property 'should be repaired, rebuilt or replaced' or until business resumes elsewhere assumes physical alteration of property[.]" Cosm. Laser, Inc., 2021 WL 3569110, at *14 (citations and quotation marks omitted).

In sum, the term "direct physical loss of or damage to property" is reasonably susceptible to only one interpretation, and unambiguously requires a physical alteration to property.

Accordingly, the Court joins the other courts in the District of Connecticut and throughout the Second Circuit to hold that "the terms 'direct physical loss' and 'physical damage' ... do not extend to mere loss of use of a premises, where there has been no physical damage to such premises; those terms instead require actual physical loss of or damage to the insured's property." 10012 Holdings, Inc. v. Sentinel Ins. Co., Ltd., 21 F.4th 216, 222 (2d Cir. 2021); see also Kim-Chee LLC v. Philadelphia Indem. Ins. Co., No. 21-1082-cv, 2022 WL 258569, at *1 (2d Cir. Jan. 28, 2022) ("[T]o survive dismissal, [plaintiff's] complaint must plausibly allege that the virus itself inflicted actual physical loss of or damage to property." (citation and quotation marks omitted)); Rye Ridge Corp. v. Cincinnati Ins. Co., No. 21-1323-cv, 2022 WL 120782, at *2 (2d Cir. Jan. 13, 2022) (dismissing claim for coverage where plaintiffs did "not allege any physical damage to their insured premises"); Conn. Children's Med. Ctr, 2022 WL 168786, at *6 (D. Conn. Jan. 19, 2022) ("In short, whether the theory is based on 'loss of use' of property or based on 'physical damage' from the COVID-19 virus itself, the result is the same: there is no 'direct physical loss or damage' to property."); Cosm. Laser, Inc., 2021 WL 3569110, at *13 ("Under ... Connecticut law, 'direct physical loss' requires physical alteration of property."); Farmington Vill. Dental Assocs., LLC v. Cincinnati

Ins. Co., --- F. Supp. 3d ---, No. 3:20CV01647(VAB), 2021 WL
3036902, at *10 (D. Conn. July 19, 2021) ("Under Connecticut
law, however, losses due to a property's inoperability without
any physical loss or damage to the property itself are not
recoverable with this type of property insurance coverage.").[6]

### 3.   Plaintiffs' Theories of Coverage

Plaintiffs assert that they are entitled to coverage under
the Policies due to: (1) "[l]oss of use" caused both by "the
presence of SARS-CoV-2 or the imminent risk of the presence of
SARS-CoV-2[,]" Doc. #1 at 15, and by "government orders" issued
as a result of the pandemic, Doc. #35 at 19; see also Doc. #1 at
21; (2) "actual presence of SARS-CoV-2 at the Covered
Properties" as well as the "imminent risk of contamination[,]"
Doc. #1 at 21; and (3) "the absence of a Pandemic exclusion" in
the Policies. Doc. #35 at 30. None of plaintiffs' arguments are
persuasive.

#### a.   *Loss of Use*

Plaintiffs assert that they suffered a physical loss, and
are therefore entitled to coverage, due to the "[l]oss of use"

---

[6] Plaintiffs have provided citations to a number of cases to
support their argument that direct physical loss or damage does
not require physical alteration to property. See generally Doc.
#35. However, this Court declines to follow such cases, which
constitute a minority position nationwide, because they are
unpersuasive, distinguishable, and do not apply Connecticut law.

caused both by "the presence of SARS-CoV-2 or the imminent risk of the presence of SARS-CoV-2[,]" Doc. #1 at 15, and by "government orders" issued as a result of the pandemic. Doc. #35 at 19; see also Doc. #1 at 21. Plaintiffs further assert, in an attempt to invoke Civil Authority coverage, that "due to the physical loss at other locations caused by the Pandemic, the governmental orders at issue forced the plaintiff to suspend its ordinary business operations." Doc. #35 at 31.

This theory fails, however, because plaintiffs do not assert any physical loss of, or damage to, property. Indeed, the Second Circuit recently rejected such a theory when applying New York law. In 10012 Holdings, Inc. v. Sentinel Ins. Co., Ltd., 21 F.4th 216 (2d Cir. 2021), the Second Circuit considered an insurance claim by an art gallery for business loss-of-use stemming from the COVID-19 pandemic. See id. at 219. The policy at issue was limited to "direct physical loss or physical damage[,]" id., and the Second Circuit relied on New York state appellate court authority interpreting a policy allowing coverage for "'all risks of direct physical loss or damage to the [insured's] property,'" and in which "the Appellate Division held that the provision 'clearly and unambiguously provides coverage only where the insured's property suffers direct physical damage.'" Id. at 221 (quoting Roundabout Theatre Co. v. Cont'l Cas. Co., 302 A.D.2d 1, 8 (N.Y. App. Div. 1st Dep't

2002)). The Second Circuit went on to explain that "'direct physical loss' and 'physical damage' in the Business Income and Extra Expense provisions do not extend to mere loss of use of a premises, where there has been no physical damage to such premises; those terms instead require actual physical loss of or damage to the insured's property." Id. at 222.

Plaintiffs attempt to distinguish this holding on the grounds that "[t]he 10012 Holdings case did not involve Connecticut law -- the insurance policy in that case was governed by the substantive law of the State of New York." Doc. #92 at 1. Specifically, plaintiffs assert that "10012 Holdings is inapposite to the Erie analysis in this case, and [the Court] should instead maintain its focus on how the Connecticut Supreme Court likely would rule in this matter[.]" Id. at 2.

When a district court addresses an unsettled question of state law, its "task is to predict how the Connecticut Supreme Court would decide the issue[.]" Conn. Children's Med. Ctr., 2022 WL 168786, at *4; see also In re Thelen LLP, 736 F.3d 213, 219 (2d Cir. 2013) ("Where state law is unsettled, [the Court is] obligated to carefully predict how the state's highest court would resolve the uncertainty or ambiguity." (citation and quotation marks omitted)). To date, only one court has had the opportunity to analyze 10012 Holdings' applicability under

Connecticut law. In conducting that analysis, Judge Meyer held that he was "persuaded by these federal appeals court decisions as well as those district court rulings that have applied Connecticut law to similarly reject the 'loss of use' theory of coverage." Conn. Children's Med. Ctr., 2022 WL 168786, at *4.

The undersigned finds Judge Meyer's analysis persuasive. The only Connecticut decisions plaintiffs rely upon to contend that the Connecticut Supreme Court would "find coverage in the present circumstances[,]" Doc. #92 at 3, are "Beach v. Middlesex Mutual Assurance Company, 205 Conn. 246 (1987) and Karas v. Liberty Mutual Insurance Corporation, 335 Conn. 62 (2019)." Id. at 2. Neither case is persuasive here.

In both Beach and Karas, the Connecticut Supreme Court interpreted the meaning of the term "collapse" under the relevant insurance policies. In Beach, the court held:

> Although 'collapse' encompasses a catastrophic breakdown, as the defendant argues, it also includes a breakdown or loss of structural strength, as the plaintiffs maintain. If the defendant wished to rely on a single facial meaning of the term 'collapse' as used in its policy, it had the opportunity expressly to define the term to provide the limited usage it now claims to have intended.

Beach v. Middlesex Mut. Assur. Co., 532 A.2d 1297, 1299-1300 (Conn. 1987). Similarly, in Karas, the court held that "if the defendant had wished to limit its collapse coverage to a sudden and catastrophic event, it very easily could have done so in

plain and unambiguous terms." <u>Karas v. Liberty Ins. Corp.</u>, 228
A.3d 1012, 1023 (Conn. 2019).

Crucially, however, in each of those cases the court found
that the relevant contractual language was <u>ambiguous</u> before
adopting the plaintiff's proposed interpretation. To the
contrary here, for the reasons described above, the term "direct
physical loss of or damage to property" is unambiguous under the
Policies.

Because the Court finds that the term "physical loss of or
damage to property" is unambiguous under plaintiffs' Policies,
the Connecticut Supreme Court cases plaintiffs rely on are
inapposite. Plaintiffs' arguments are unavailing. Accordingly,
plaintiffs' "loss of use" theory is insufficient to allege
direct physical loss or damage under the Policies.

        b.    *COVID-19's Physical Impact on Property*

Plaintiffs further assert that "the actual presence of
SARS-CoV-2 at the Covered Properties"[7] and the "[t]he imminent

---

[7] Plaintiffs appear to have backtracked from this argument while
briefing discovery disputes, asserting that "plaintiffs have
clearly responded in discovery that their losses were not caused
by the presence of SARS-CoV-2 on the insured premises. Instead,
the plaintiffs have been explicit that their losses were caused
by the Pandemic, the imminent risk of transmission of the highly
communicable SARS-CoV-2 virus, as well as Governor Lamont's
Executive Orders and Centers for Disease Control, Connecticut
Department of Public Health, and Occupational Safety and Health
Administration guidance." Doc. #63 at 3 (citations and quotation
marks omitted). However, the Court will consider plaintiffs'
arguments based upon the presence of COVID-19 at the Covered

risk of contamination and other damages caused by SARS-CoV-2"
constitute direct physical loss or damage under the Policies.
Doc. #1 at 21.

Courts in the Second Circuit have consistently rejected
this theory. Judge Meyer recently addressed such a claim:

> [T]he policy terms "direct physical loss or physical
> damage" required some form of physical or structural
> alteration to the policyholder's property in the form of
> a perceptible harm and with observable, tangible
> effects. [Cosm. Laser, Inc., 2021 WL 3569110, at *13.]
> "The presence of fleeting, microscopic entities does not
> amount to significant structural change," and "'[i]f,
> for example, a sick person walked into one of Plaintiffs'
> restaurants and left behind COVID-19 particulates on a
> countertop, it would strain credulity to say that the
> countertop was damaged or physically altered as a
> result.'" Id. at ---, 2021 WL 3569110 at *14 (quoting
> Unmasked Mgmt., Inc. v. Century-National Ins. Co., 514
> F. Supp. 3d 1217, 1226 (S.D. Cal. 2021)). The fact that
> virus particles infiltrate and linger in the air and on
> interior surfaces in a manner that is not permanent and
> that could be sanitized with ordinary household cleaner
> did not amount to "physical loss or physical damage" to
> the property. Ibid.

Conn. Children's Med. Ctr., 2022 WL 168786, at *5; see also
Cosm. Laser, Inc., 2021 WL 3569110, at *13-*14.

The undersigned agrees, especially in light of the
Connecticut Supreme Court's decision in Capstone Bldg. Corp. v.
Am. Motorists Ins. Co., 67 A.3d 961 (Conn. 2013). There,

_____

Properties because such allegations are made in plaintiffs'
Complaint and were fully briefed as part of defendants' motion
to dismiss.

increased carbon monoxide levels were present at a covered property. See id. at 971. The policy covered "'[p]roperty damage[,]'" which was defined in relevant part to include "'[p]hysical injury to tangible property, including all resulting loss of use of that property[.]'" Id. at 976. The court rejected plaintiffs' claims for coverage under that provision, holding that "the escape of carbon monoxide, without more, is not property damage." Id. at 979. "Although the Capstone decision involved different policy language than the language at issue in this case, it tends if anything to support the defendants here because it interprets the term 'property damage' to require no less than a physical and tangible alteration to the property." Conn. Children's Med. Ctr., 2022 WL 168786, at *5.[8]

Thus, it is not enough for plaintiffs to allege the mere presence (or potential presence) of COVID-19 on any premises. To be entitled to coverage under the Policies, they must also

---

[8] Plaintiffs attempt to distinguish Capstone by arguing that it "does not apply to the present case, where the policies at issue does not require 'physical injury.' In quite the opposite circumstance, as detailed above, the policies at issue here specifically use the disjunctive in their grants of coverage to provide coverage for both 'physical loss' and 'physical damage.'" Doc. #35 at 8 (sic). However, plaintiffs do not argue that physical injury is distinguishable from physical damage. Moreover, for the reasons described supra at 16-17, plaintiffs' arguments concerning the disjunctive use of 'physical loss' and 'physical damage' are unpersuasive.

allege facts showing that COVID-19 caused actual direct physical loss of, or damage to, property. They have not done so here. Accordingly, plaintiffs have failed to adequately allege that they are entitled to coverage under this theory.

        c.   *The Absence of a Pandemic Exclusion*

      Plaintiffs further allege that "the absence of a Pandemic exclusion is persuasive evidence of the fact that the policies do, in fact, provide coverage for a Pandemic." Doc. #35 at 30. However, as the Second Circuit held when rejecting a directly analogous argument, "[t]he absence of an exclusion cannot create coverage; the words used in the policy must themselves express an intention to provide coverage." Kim-Chee LLC, 2022 WL 258569, at *2 (citations and quotation marks omitted). Accordingly, coverage is not required on this basis.

      In sum, none of plaintiffs' attempts to classify the impact of COVID-19 as a "physical loss of or damage to property" succeeds. Moreover, plaintiffs are unable to create an affirmative right to coverage by pointing to the absence of a pandemic exclusion in the Policies. Plaintiffs have thus failed to adequately allege a right to coverage under the Policies' Business Income, Extra Expense, or Civil Authority provisions. Accordingly, plaintiffs' claim for breach of contract is hereby **DISMISSED.**

**B.   The Implied Covenant of Good Faith and Fair Dealing**

Plaintiffs assert that defendants breached the implied covenant of good faith and fair dealing by: (1) "failing to grant coverage under the term of this contract[,]" Doc. #35 at 35 (sic); (2) "using a predetermined decision not to cover any claim; failing to properly inquire into relevant facts supporting their denial; [and] failing to take appropriate procedures for handling Plaintiff's claim[,]" Doc. #1 at 22; and (3) "wrongful[lly] fail[ing] to respond to the plaintiffs' claim and notice of loss over the course of one year." Doc. #35 at 33; see also Doc. #1 at 22.

Under Connecticut law, the "duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship. In other words, every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." Capstone Bldg. Corp., 67 A.3d at 986 (citation and quotation marks omitted).

> To constitute a breach of the implied covenant of good faith and fair dealing, the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith. Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some

interested or sinister motive. Bad faith means more than mere negligence; it involves a dishonest purpose.

De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., 849 A.2d 382, 388 (Conn. 2004) (citations and quotation marks omitted). Specifically, in the context of an insurance contract, a bad faith action requires a "denial of a contractually mandated benefit[.]" Capstone Bldg. Corp., 67 A.3d at 987.

Plaintiffs first assert that "by failing to grant coverage under the term of this contract, the plaintiffs have been wrongfully denied the benefits of the contract." Doc. #35 at 35 (sic). However, the Court has concluded that defendants properly denied plaintiffs' claims for coverage. See supra at 29. Because plaintiffs' "breach of contract claim fails, so too does [their] claim for bad faith denial of coverage." Mazzarella v. Amica Mut. Ins. Co., No. 3:17CV00598(SRU), 2018 WL 780217, at *7 (D. Conn. Feb. 8, 2018) (citation and quotation marks omitted), aff'd, 774 F. App'x 14 (2d Cir. 2019); see also Conn. Children's Med. Ctr., 2022 WL 168786, at *6 ("[I]n the absence of any underlying breach of contract claim, the plaintiffs have no claim for breach of the implied covenant of good faith and fair dealing.").

Second, plaintiffs assert that defendants "violated the covenant of good faith and fair dealing by using a predetermined decision not to cover any claim; failing to properly inquire

into relevant facts supporting their denial; [and] failing to take appropriate procedures for handling Plaintiff's claim[.]" Doc. #1 at 22. The Court construes each of these theories to fall under the umbrella of a claim of bad faith failure to investigate and reach individualized decisions as to coverage based on that investigation. However, "[u]nless the alleged failure to investigate led to the denial of a contractually mandated benefit in this case, the plaintiffs have not raised a viable bad faith claim." Capstone Bldg. Corp., 67 A.3d at 987. Thus, because defendants properly denied plaintiffs' claims, plaintiffs cannot establish that defendants' alleged failure to adequately investigate their claims led to the denial of a contractually mandated benefit. Therefore, plaintiffs have failed to state a claim for breach of the implied covenant under this theory.

Finally, plaintiffs assert that "the defendants acted in bad faith in their wrongful failure to respond to [certain] plaintiffs' claim and notice of loss over the course of one year." Doc. #35 at 33; see also Doc. #1 at 22. Yet plaintiffs fail to assert any way in which Litchfield Hills Orthopedic and Litchfield Hills Surgical Center -- the plaintiffs to whom defendants allegedly failed to respond -- were harmed by the purported delay. Rather, the only harm that plaintiffs identify relates to the denial of coverage. Further, plaintiffs fail to

point to any contractual terms in the Policies "regarding method and/or timing of investigation of claims, communication by the insurer to the insured, or how/when the insurer must close the file on an insurance claim." <u>Tucker v. Am. Int'l Grp., Inc.</u>, No. 3:09CV01499(CSH), 2015 WL 403195, at *21 (D. Conn. Jan. 28, 2015). Absent such allegations, plaintiffs have not adequately asserted a "breach of a duty <u>under the contract</u> (<u>e.g.</u>, wrongful denial of a covered claim)[.]" <u>Id.</u> Thus "there can be no viable bad faith claim based on" defendants' failure to timely respond to Litchfield Hills Orthopedic and Litchfield Hills Surgical Center's notice of loss. <u>Id.</u>

Accordingly, plaintiffs have failed to state a claim against defendants for breach of the implied covenant of good faith and fair dealing. Count Two is therefore **DISMISSED**.

## VI. <u>Motion for Leave to Amend</u>

Plaintiffs belatedly seek to amend their complaint to allege "violations of the Connecticut Unfair Trade Practices Act ('CUTPA') and the Connecticut Unfair Insurance Practices Act ('CUIPA')." Doc. #83 at 1. Defendants filed an opposition to plaintiffs' motion on December 13, 2021. <u>See</u> Doc. #87. Plaintiffs filed a reply on December 27, 2021. <u>See</u> Doc. #88.

"Although Fed. R. Civ. P. 15(a) provides that leave to amend a complaint 'shall be freely given when justice so requires,' Fed. R. Civ. P. 15(a), it is within the sound

discretion of the district court whether to grant or deny leave
to amend." Zahra v. Town of Southold, 48 F.3d 674, 685 (2d Cir.
1995). Where, as here, the Court has entered a scheduling order,
see Doc. #72,[9] and the date to amend pleadings has passed, the
lenient standard under Rule 15(a) must be balanced against the
requirement under Rule 16(b) that the Court's scheduling order
shall not be modified except upon a showing of good cause. See
Grochowski v. Phoenix Constr., 318 F.3d 80, 86 (2d Cir. 2003);
Fed. R. Civ. P. 15(a); Fed. R. Civ. P. 16(b). "The burden is on
the party who wishes to amend to provide a satisfactory
explanation for the delay[.]" Cresswell v. Sullivan & Cromwell,
922 F.2d 60, 72 (2d Cir. 1990).

     "Under Rule 16(b), a court may exercise its discretion to
deny a motion to amend due to the moving party's undue delay,
bad faith or dilatory motive, repeated failure to cure
deficiencies by previously allowed amendment, undue prejudice to
the opposing party or futility of the amendment." Dall v.
Certified Sales, Inc., No. 3:08CV00019(DFM), 2011 WL 572389, at
*1 (D. Conn. Feb. 15, 2011). The Court finds that amendment

---

[9] Although the parties' 26(f) Report states that "Plaintiffs
reserve the right to request leave to amend to add a claim under
CUTPA/CUIPA if the Plaintiffs feel it is warranted after
discovery[,]" Doc. #33 at 11, the Court's Revised Scheduling
Order and Case Management Plan makes clear that "[a]ny motion to
amend the pleadings or join parties will be governed by the good
cause standard of Fed. R. Civ. P. 16(b)." Doc. #72 at 1.

should be denied, on the bases of futility and undue delay in
proposing the amendment.

### A.    Futility of the Amendment

"An amendment to a pleading is futile if the proposed claim
could not withstand a motion to dismiss pursuant to Fed. R. Civ.
P. 12(b)(6)." Lucente v. Int'l Bus. Mach. Corp., 310 F.3d 243,
258 (2d Cir. 2002).

Plaintiffs' proposed claims under CUTPA/CUIPA fail to state
a claim upon which relief can be granted. CUTPA provides, in
relevant part, that "[n]o person shall engage in unfair methods
of competition and unfair or deceptive acts or practices in the
conduct of any trade or commerce." Conn. Gen. Stat. §42-110b(a).
"While CUIPA does not create a private right of action,
violations of CUIPA may be alleged as a basis for a CUTPA cause
of action." Zeitler v. Nationwide Prop. & Cas. Ins. Co., No.
3:21CV00519(JBA), 2021 WL 6125680, at *2 (D. Conn. Dec. 27,
2021). Thus, "[i]f a plaintiff brings a claim pursuant to CUIPA
alleging an unfair insurance practice, and the plaintiff further
claims that the CUIPA violation constituted a CUTPA violation,
the failure of the CUIPA claim is fatal to the CUTPA claim."
Bilyard v. Am. Bankers Ins. Co. of Fla., No. 3:20CV01059(JBA),
2021 WL 4291173, at *2-*3 (D. Conn. Sept. 21, 2021) (citing
State v. Acordia, Inc., 73 A.3d 711, 729 (Conn. 2013)).

To succeed on a claim under CUTPA/CUIPA, "a plaintiff must show that the defendant engaged in an act prohibited by CUIPA's substantive provisions, and that the act proximately caused the harm alleged." Belz v. Peerless Ins. Co., 46 F. Supp. 3d 157, 165 (D. Conn. 2014). Among other things, CUIPA prohibits insurers from engaging in certain defined unfair insurance "practices committed with [such] frequency as to indicate a general business practice[.]" Bilyard, 2021 WL 4291173, at *2 (citing Conn. Gen. Stat. §38a-816(6)).

Plaintiffs explain that their proposed CUTPA/CUIPA claim essentially mirrors their claim for breach of the implied covenant. See Doc. #83 at 2 ("Count Two of the operative Complaint already has alleged a bad faith claim against the defendants, and the CUTPA/CUIPA claim in Count Three of the proposed Amended Complaint concerns the same conduct as the bad faith claim in Count Two."). Specifically, plaintiffs assert that "[i]n their handling of business interruption losses caused by the Pandemic, Defendants have a general business practice of refusing to pay claims without conducting a reasonable investigation based upon all available information or attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability is reasonably clear." Doc. #83-1 at 19. Such allegations fail to state a claim upon

which relief can be granted, as did the previously pled breach
of the implied covenant claim.

Plaintiffs assert that defendants failed to "attempt[] in
good faith to effectuate prompt, fair and equitable settlement
of claims in which liability is reasonably clear." Id. CUIPA
does provide that it may be an unfair insurance practice to
engage in such conduct. See Conn. Gen. Stat. §38a-816(6)(F).
However, "[w]hen a defendant's interpretation of a policy ... is
correct, an insured cannot demonstrate that 'application of that
interpretation as a general business practice constitute[s]
oppressive, unethical or unscrupulous conduct.'" Gilmore v.
Tchrs. Ins. Co., No. 3:18CV01856(JBA), 2019 WL 4192287, at *4
(D. Conn. Sept. 4, 2019) (quoting Zulick, 949 A.2d at 1091-92).

For the reasons described above, defendants properly
determined that plaintiffs were not entitled to coverage under
the Policies. Plaintiffs simply cannot sensibly claim that the
proper denial of coverage constitutes an unfair insurance
practice. See Farmington Vill. Dental Assocs., 2021 WL 3036902,
at *14 ("[B]ecause Farmington Village's breach of contract claim
fails, its CUTPA and CUIPA claims fail as well."). Accordingly,
because the Court concludes that defendants' denial of coverage
was justified, plaintiffs fail to state a claim for violation of
CUTPA/CUIPA on this basis.

Second, plaintiffs assert that "Defendants have a general business practice of refusing to pay claims without conducting a reasonable investigation based upon all available information[.]" Doc. #83-1 at 19. Again, CUIPA provides that it may be an unfair insurance practice to engage in such conduct. See Conn. Gen. Stat. §38a-816(6)(D). Plaintiffs fail, however, to point to any relevant facts that defendants allegedly failed to investigate or adequately consider. See Royal Indem. Co. v. King, 532 F. Supp. 2d 404, 412 (D. Conn. 2008), aff'd sub nom. Arrowood Indem. Co. v. King, 699 F.3d 735 (2d Cir. 2012). Plaintiffs do not, for example, "allege that [defendants] gathered incorrect facts[.]" Id. Nor do they contend that defendants failed to consider available facts that were relevant to their claims. Instead, it appears that "the sole basis for [plaintiffs'] assertion that [defendants'] investigation was unreasonable was that [defendants'] decision to deny coverage ... was improper." Id. Such allegations are insufficient to state a claim under CUTPA/CUIPA.

Finally, to the extent plaintiffs' proposed Amended Complaint alleges that defendants violated CUTPA/CUIPA because they "fail[ed] to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed[,]" Conn. Gen. Stat. §38a-816(6)(E), such claims fail because plaintiffs do not allege that defendants engaged in that

practice "with such frequency as to indicate a general business
practice[.]" Conn. Gen. Stat. §38a-816(6). Indeed, plaintiffs'
proposed Amended Complaint asserts that "Continental Casualty
Company and/or CNA Financial Corporation have been named
defendants in over 40 lawsuits nationally since March 2020
concerning Defendants' failure to investigate Pandemic-related
business interruption claims in good faith and their denial of
these claims as part of a national strategy not to provide
coverage for any such claims[.]" Doc. #83-1 at 19-20.
Plaintiffs' proposed Amended Complaint fails, however, to point
to a single additional instance in which defendants have failed
to timely respond to a notice of claim. Absent such an
allegation, plaintiffs have not adequately asserted that
defendants' failure to respond to claims constituted a general
business practice under CUIPA. See Lees v. Middlesex Ins. Co.,
643 A.2d 1282, 1286 (Conn. 1994) ("We conclude that the
defendant's alleged improper conduct in the handling of a single
insurance claim, without any evidence of misconduct by the
defendant in the processing of any other claim, does not rise to
the level of a 'general business practice[.]'"). Accordingly,
plaintiffs have failed to state a claim for violation of
CUTPA/CUIPA on this basis.

    In sum, the proposed Amended Complaint fails to adequately
allege a violation of CUIPA's substantive provisions. Because

"conduct by an ... insurance company that is related to the business of providing insurance can violate CUTPA only if it violates CUIPA," Acordia, 73 A.3d at 727, the proposed amendments to the complaint would be futile.

**B.   Undue Delay**

Plaintiffs' Motion for Leave to File Amended Complaint is also denied due to plaintiffs' undue delay in asserting their claims under CUTPA/CUIPA. "[A] court may deny a motion to amend when the movant knew or should have known of the facts upon which amendment is based when the original pleading was filed, particularly when the movant offers no excuse for the delay." Kiarie v. Dumbstruck, Inc., 473 F. Supp. 3d 350, 357 (S.D.N.Y. 2020) (citation and quotation marks omitted).

Plaintiffs do not contend that they became aware of any additional facts in support of their CUTPA/CUIPA claims after filing the operative complaint in this case. See Lyddy v. Bridgeport Bd. of Educ., No. 3:06CV01420(AHN), 2008 WL 2397688, at *3 (D. Conn. June 10, 2008) ("Indeed, because the plaintiffs knew of the facts supporting the new claims at the time the original complaint was filed, it is difficult to posit a satisfactory explanation for the plaintiffs' failure to plead them at the outset."). Nor do they contend that they lacked the necessary information to assert claims under CUTPA/CUIPA when they filed their initial Complaint. See Parker v. Columbia

Pictures Indus., 204 F.3d 326, 341 (2d Cir. 2000) (affirming denial of leave to amend because "[w]hen [plaintiff] commenced this action ... [plaintiff] had all the information necessary to support [the proposed additional claim], and nothing he learned in discovery or otherwise altered that fact").

To the contrary, plaintiffs state that "the CUTPA/CUIPA claim in Count Three of the proposed Amended Complaint concerns the same conduct as the bad faith claim in Count Two." Doc. #83 at 2. Plaintiffs do not offer a satisfactory explanation for their delay. Instead, they assert that "plaintiffs have been transparent with the defendants since the parties' Rule 26(f) case management conference that the plaintiffs intended to use discovery to explore whether to pursue a CUTPA/CUIPA claim." Doc. #88 at 6. That is insufficient to satisfy Rule 16(b)'s good cause standard.

Plaintiffs' motion to amend fails because any such amendment would be futile, and because plaintiffs' proposed Amended Complaint is the product of undue delay. Accordingly, plaintiffs' Motion for Leave to File Amended Complaint is hereby **DENIED**.

## VII. <u>Conclusion</u>

For the reasons stated, the Motion to Dismiss [**Doc. #29**] is **GRANTED**, and plaintiffs' Motion for Leave to File Amended Complaint [**Doc. #83**] is **DENIED**.

The Clerk shall close this case.

It is so ordered at New Haven, Connecticut, this 3rd day of March, 2022.

<u>  /s/                        </u>
HON. SARAH A. L. MERRIAM
UNITED STATES DISTRICT JUDGE